UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

Plaintiff,

COMMONWEALTH OF MASSACHUSETTS,

Plaintiff-Intervenor,

v.

CITY OF HAVERHILL, MASSACHUSETTS,

Defendant.

CIVIL ACTION NO. 16-11698-IT

**CONSENT DECREE**

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 2

TABLE OF CONTENTS

I. STATEMENT OF CLAIM ..... 6
II. JURISDICTION AND VENUE ..... 6
III. APPLICABILITY ..... 7
IV. DEFINITIONS ..... 8
V. OBJECTIVES ..... 13
VI. CIVIL PENALTY ..... 14
VII. REMEDIAL MEASURES ..... 15
VIII. SUPPLEMENTAL ENVIRONMENTAL PROJECT ..... 38
IX. COMPLIANCE REPORTING ..... 41
X. APPROVAL OF SUBMISSIONS ..... 47
XI. STIPULATED PENALTIES ..... 48
XII. FORCE MAJEURE ..... 53
XIII. DISPUTE RESOLUTION ..... 56
XIV. RIGHT OF ENTRY/INFORMATION COLLECTION AND RETENTION ..... 59
XV. FORM OF NOTICE ..... 60
XVI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ..... 64
XVII. COSTS ..... 66
XVIII. EFFECTIVE DATE ..... 66
XIX. RETENTION OF JURISDICTION ..... 67
XX. MODIFICATION ..... 67
XXI. FUNDING ..... 69
XXII. SEVERABILITY ..... 69
XXIII. TERMINATION ..... 69

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 3

XXIV. FINAL JUDGMENT ........ 71

XXV. WAIVER OF SERVICE ........ 71

XXVI. PUBLIC COMMENT ........ 72

XXVII. SIGNATORIES ........ 72

XXVIII. INTEGRATION ........ 72

XXIX. APPENDICES ........ 73

WHEREAS, the City of Haverhill, Massachusetts (the "City") discharges pollutants into navigable waters of the United States from a publicly owned treatment works ("POTW") treatment plant that it owns and operates on South Porter Street in Haverhill, Massachusetts, pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. MA0101621 (the "POTW Permit"), which was jointly reissued by the plaintiff the United States of America (the "United States" or "U.S.") and the plaintiff-intervenor the Commonwealth of Massachusetts (the "Commonwealth") on December 5, 2007, and which became effective on February 1, 2008;

WHEREAS, the City also discharges pollutants into navigable waters of the United States from combined sewer overflow ("CSO") discharge points pursuant to the POTW Permit;

WHEREAS, the City also discharges pollutants into navigable waters of the United States from a regulated small municipal separate storm sewer system ("MS4") pursuant to NPDES Permit No. MAR041197 (the "Small MS4 General Permit"), also issued jointly by the United States and the Commonwealth, effective May 1, 2003;

WHEREAS, the United States, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint simultaneously with this Consent Decree alleging that the City has violated the POTW Permit, the Small MS4 General Permit, and Section 301(a) of the Clean Water Act ("Act" or "CWA"), 33 U.S.C. § 1311(a);

WHEREAS, the Commonwealth, on behalf of the Massachusetts Department of Environmental Protection ("MassDEP"), has filed an assented-to motion to intervene as a plaintiff in the action brought by the United States and has filed a complaint that alleges that the City was, and is, in ongoing violation of the Massachusetts Clean Waters Act, M.G.L. c. 21,

§§ 26-53 (the "Massachusetts Act"), and provisions of both the POTW Permit and the Small MS4 General Permit;

WHEREAS, the City has implemented a number of projects and measures pursuant to two Clean Water Act Administrative Orders (Docket Nos. 08-012 and 09-014) designed to reduce the frequency, volume and duration of discharges from its Combined Sewer System and bypasses of secondary treatment at the POTW's treatment plant, but acknowledges that additional projects and measures are called for;

WHEREAS, in conjunction with the process leading to, or during implementation of, a Final CSO Long-Term Control Plan ("FLTCP"), the City will conduct a feasibility study to evaluate potential locations and types of Green Infrastructure/Low Impact Development ("GI/LID") that could be constructed in the City, and to evaluate the potential benefit to CSO control that could be achieved by various green initiatives;

WHEREAS, the Parties anticipate, consistent with EPA's Integrated Planning policies, that this Consent Decree may need to be modified as the City develops, designs, submits for review and approval, and implements various projects and measures, including those involving GI/LID, as well as in the event of changes in law or regulation, changes in water quality standards, or issuance of a permit that contains new or revised requirements;

WHEREAS, EPA and MassDEP will endeavor to facilitate implementation of this Consent Decree through, in a timely manner, reviewing submissions and responding to inquiries;

WHEREAS, entry of this Consent Decree by the Court will resolve all claims in the complaint of the United States and the plaintiff-intervenor's complaint of the Commonwealth,

referred to herein collectively as the "Complaints," and with entry, this Consent Decree will supersede Administrative Orders Nos. 08-012 and 09-014;

WHEREAS, the United States, the Commonwealth, and the City (collectively, the "Parties") recognize, without admission of facts or law except as expressly stated herein and without admission of liability by the City, and the Court by entering this Consent Decree finds, that this Consent Decree is fair and reasonable, has been negotiated in good faith, is in the public interest, and entry of this Consent Decree without further litigation is an appropriate resolution of the disputes;

NOW, THEREFORE, it is hereby ordered, adjudged, and decreed as follows:

## I. STATEMENT OF CLAIM

1. The Complaints state claims upon which relief can be granted against the City pursuant to Section 309 of the CWA, 33 U.S.C. § 1319, and pursuant to the Massachusetts Act, M.G.L. c. 21, § 42.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355, and under the doctrine of pendent jurisdiction. This Court has personal jurisdiction over the Parties to this Consent Decree. Venue properly lies in this district pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), 28 U.S.C. §§ 1391(b) and (c), and 28 U.S.C. § 1395. The City waives all objections it might have raised to such jurisdiction or venue.

## III. APPLICABILITY

3. The provisions of this Consent Decree shall apply to and be binding upon the United States, the Commonwealth, and upon the City and its officers and employees acting in their official capacities, and its agents, successors and assigns.

4. No transfer of any ownership interest in, or any interest in the operation of, the POTW or MS4, whether in compliance with this Paragraph or otherwise, shall relieve the City of its obligation to ensure that the terms of this Consent Decree are implemented. Any transfer involving ownership or operation of the POTW or MS4, or any portions thereof, to any other person or entity must be conditioned upon the transferee's agreement to be added as a party to this Consent Decree and to be jointly and severally liable with the City to undertake all obligations required by this Consent Decree. At least 30 Days prior to such transfer, the City shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the above-referenced written agreement, to EPA, the United States Attorney, the United States Department of Justice, MassDEP, and the Commonwealth in accordance with Section XV (Form of Notice) herein.

5. The City shall provide a copy of this Consent Decree to all of its officers and agents whose duties might reasonably include compliance with any provisions of this Consent Decree. The City shall also provide a copy of this Consent Decree to all contractors and consultants it retains to perform any obligation required by this Consent Decree on behalf of the City, and condition any such contract upon performance of the work in conformity with the terms of this Consent Decree. The City shall require that such contractors and consultants provide a copy of this Consent Decree to their subcontractors to the extent the subcontractors are

performing work subject to this Consent Decree. Such contractors, consultants and subcontractors shall be deemed agents of the City for the purposes of this Consent Decree. In an action to enforce this Consent Decree, the City shall not assert as a defense against an action by EPA or the Commonwealth the failure by any of its officers, directors, employees, agents (contractors, consultants and subcontractors), successors, and assigns to take actions necessary to comply with this Consent Decree.

## IV. DEFINITIONS

6. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in the CWA or in regulations promulgated under the CWA shall have the meaning ascribed to them in the CWA or in the regulations promulgated thereunder. Whenever the terms listed below are used in this Consent Decree, the following definitions shall apply.

a. "Act" or "CWA" shall mean the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act), as amended, 33 U.S.C. §§ 1251-1387.

b. "Approval by EPA" or "Approved by EPA" shall mean the issuance of a written approval document from EPA, after a reasonable opportunity for review and comment by MassDEP, approving and/or approving with conditions a submission in accordance with Section X (Approval of Submissions) herein.

c. "Approval by EPA and MassDEP" or "Approved by EPA and MassDEP" shall mean the issuance of a single joint written approval document, or two separate approval documents with identical operational text, from EPA and MassDEP approving and/or approving with conditions a submission in accordance with Section X (Approval of Submissions) herein.

d. "Best Management Practices" or "BMPs" shall mean schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the discharge of pollutants to waters of the United States. BMPs also include treatment requirements, operating procedures, and practices to control POTW treatment plant runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.

e. "Building/Private Property Backup" shall mean any release of sanitary wastewater from the Collection System into buildings or onto private property, except (i) a release that is the result of blockages, flow conditions, or malfunctions of a building lateral or other piping/conveyance system that is not owned or operationally controlled by the City, or (ii) is the result of overland surface flooding not emanating from the Collection System.

f. "Bypass" shall mean the intentional or unintentional diversion of waste streams from any portion of a treatment facility, including, without limitation, the diversion of waste streams from a secondary treatment facility during high wet weather or significant snow melt flows.

g. "Collection System" shall mean the wastewater collection, storage and transmission system (a.k.a. sanitary and Combined Sewer System) owned or operated by the City, including, but not limited to, all devices, pump stations, force mains, gravity sewer lines, manholes, and appurtenances.

h. "Combined Sewer Overflow" or "CSO" shall mean any overflow or other discharge from the City's Combined Sewer System that results from wet weather flows in excess of the carrying capacity of the Combined Sewer System.

i. “Combined Sewer System” shall mean the pipelines, conduits, pump stations, force mains, and all other structures, devices, appurtenances, and facilities used for collecting and conveying sanitary wastewaters (domestic, commercial and industrial wastewaters) and stormwater to the POTW’s treatment plant, and hydraulically connected pipelines, conduits, pump stations, force mains, and all other structures, devices, appurtenances, and facilities that periodically convey a mixture of sanitary wastewater and stormwater to waters of the United States.

j. “Consent Decree” or “Decree” shall mean this Consent Decree and all appendices hereto. In the event of conflict between this Decree and any appendix, this Decree shall control.

k. “Construction Site” shall mean any development or redevelopment or other construction activity of a site, parcel and/or building, at least a portion of which is within the limits of the City, that is projected to disturb equal to or greater than one acre of land. Construction Site shall also include any development or redevelopment or other construction activity of a site, parcel and/or building, at least a portion of which is within the limits of the City, disturbing less than one acre of total land area, where the development or redevelopment or other construction activity is part of a larger common plan calling for the disturbance of one acre or more of land.

l. “Date of Lodging” shall mean the Day this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the District of Massachusetts.

m. "Day" shall mean a calendar Day. In computing any period of time under this Consent Decree, when the last Day would fall on a Saturday, Sunday, or federal or state holiday, the period shall run until the close of business of the next business Day.

n. "Effective Date" is defined as set forth in Section XVIII (Effective Date) herein.

o. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

p. "Excessive Infiltration/Inflow" or "Excessive I/I" shall mean the Infiltration/Inflow (i) that cost-effectively can be eliminated from the Collection System, as determined by an analysis that compares the cost of eliminating the I/I with the total costs of transport and treatment of the I/I (including the capital costs of increasing the POTW's capacity and treatment operations, and the resulting operating costs), or (ii) that, with respect only to sanitary sewer overflows ("SSOs"), must be eliminated regardless of cost effectiveness to prevent SSOs that present an unacceptable risk, as determined by EPA and MassDEP, to public health and water resources.

q. "Exfiltration" shall mean the water that exits the Collection System through such means as, but not limited to, defective pipes, pipe joints, connections or manhole structures.

r. "Flow" shall mean all stormwater and sanitary (domestic, commercial and industrial) wastewater conveyed by any portion of the Collection System.

s. "Green Infrastructure/Low Impact Development" or "GI/LID" shall mean the range of stormwater control measures that use natural or engineered systems to direct

stormwater to areas where it can be stored, infiltrated, evapotranspirated, or reused.  GI/LID may include, but is not limited to, bioretention and extended detention wetland areas, vegetated swales, pocket wetlands, rain gardens, infiltration planters, green roofs, and porous and permeable pavements.

t.      "IDDE Program" shall mean an illicit discharge, detection, and elimination program, the goal of which is to identify and eliminate unauthorized discharges of wastewater to the MS4.

u.      "Infiltration" shall mean the water that enters the Collection System (including sewer service connections) from the ground through such means as, but not limited to, defective pipes, pipe joints, connections or manholes.  Infiltration does not include, and is distinguished from, Inflow.

v.      "Infiltration/Inflow" or "I/I" shall mean the total quantity of water from both Infiltration and Inflow into the Collection System without distinguishing the source.

w.      "Inflow" shall mean all water other than sanitary flow that enters the Collection System and sewer service connections from sources such as, but not limited to, roof leaders, cellar drains, yard drains, sump pumps, area drains, foundation drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins or drainage structures.  Inflow does not include, and is distinguished from, Infiltration.

x.      "MassDEP" shall mean the Massachusetts Department of Environmental Protection and any successor departments or agencies of the Commonwealth.

y. “Municipal Separate Storm Sewer System” or “MS4” shall mean the system of conveyances owned or operated by the City, designed to collect and convey stormwater to waters of the United States, and which is not a part of the POTW.

z. “Paragraph” shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper or lower case letter or letters.

aa. “Parties” shall mean the United States, the Commonwealth, and the City collectively.

bb. “Sanitary Sewer Overflow” or “SSO” shall mean any overflow, spill, diversion, or release of wastewater from the Collection System to the surface waters of the United States or to the groundwater of the Commonwealth. A CSO is not an SSO.

cc. “Section” shall mean a portion of this Consent Decree identified by a Roman numeral.

dd. “Sewershed” shall mean a major portion of the Collection System that drains to one, or a limited number of, large-diameter collection pipes.

ee. “Sub-catchment Area” shall mean the geographical area served by and drained to a distinct portion of the MS4.

## V. OBJECTIVES

7. It is the express purpose of the Parties in entering into this Consent Decree to require the City to take measures necessary to meet the requirements of the CWA and the Massachusetts Act, and to achieve and maintain compliance with the Small MS4 General Permit and the POTW Permit, and all applicable federal and state regulations. The obligations that the

City assumes pursuant to this Consent Decree supersede in full those in Administrative Orders Nos. 08-012 and 09-014.

8. Engineering designs and analyses required to be performed pursuant to this Consent Decree shall be conducted using sound, generally accepted engineering practices.

VI. CIVIL PENALTY

9. Within 30 Days of the Effective Date, the City shall pay a civil penalty in the amount of $125,000 ("the Civil Penalty") to the United States and the Commonwealth of Massachusetts in satisfaction of the claims for civil penalties alleged in the Complaints. Of the total Civil Penalty, the City shall pay $62,500 to the United States and shall pay $62,500 to the Commonwealth. Such payments shall be made in accordance with the procedures set forth in Paragraphs 10 and 11 below. If any portion of the required payments is not made within 30 Days of the Effective Date, then the City shall pay interest on the unpaid amount at the rate specified in 28 U.S.C. § 1961, accruing from the Effective Date through the date that the Civil Penalty payments are fully satisfied.

10. Within 30 Days of the Effective Date, the City shall make payment of $62,500 by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with written instructions to be provided to the City by the United States Attorney's Office for the District of Massachusetts, Financial Litigation Unit, Boston, Massachusetts. The costs of such electronic funds transfer shall be the responsibility of the City. At the time of payment, the City shall send a copy of the EFT authorization form, the EFT transaction record, and a transmittal letter, which shall state that the payment is for the Civil Penalty owed pursuant to this Consent Decree in United States v. City of Haverhill, Massachusetts, and shall reference

the civil action number and DOJ case number 90-5-1-1-10992 to EPA and the United States Department of Justice as specified in Section XV (Form of Notice) by email to: acctsreceivable.CINWD@epa.gov, and by mail to:

EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

11. Within 30 Days of the Effective Date, the City shall also make payment to the Commonwealth by FedWire Electronic Funds Transfer in the amount of $62,500 in accordance with current EFT procedures, referencing the Massachusetts Office of the Attorney General's Case CIV No. 14-01-27645 and referencing this action. The City shall send a copy of the EFT authorization form for this transfer, the EFT record and the transmittal letter to MassDEP and the Massachusetts Attorney General's Office as specified in Section XV (Form of Notice) herein.

VII. REMEDIAL MEASURES

A. Monitoring for IDDE Program

12. The City shall inspect and sample its MS4 outfalls in accordance with the IDDE Plan developed pursuant to Paragraph 14 of this Consent Decree.

13. Beginning December 31, 2015, at least once under dry-weather conditions (*i.e.*, less than 0.1 inches of rain in the preceding 48 hours, and no significant snowmelt), the City shall inspect each of its MS4 outfalls and CSO outfalls that convey stormwater and sample those with Flow. Outfall discharge samples shall be analyzed in accordance with the IDDE Plan developed pursuant to Paragraph 14 of this Consent Decree. The City shall maintain detailed and accurate records of the date and time that sampling was conducted and the weather conditions both during, and in the 48 hours prior to, each sampling event. Samples shall be

analyzed for the parameters outlined in the IDDE Plan developed pursuant to Paragraph 14 of this Consent Decree, using sound, generally-accepted sampling and analysis practices.

B. MS4 Sub-Catchment Area Illicit Discharge Investigations

14. Within 90 Days of the Effective Date, the City shall submit for review and Approval by EPA, and to MassDEP for review, a revised IDDE Plan for screening and monitoring, including appropriate wet-weather monitoring, of MS4 outfalls and investigation of Sub-catchment Areas as required by Part II.B.3.(c) of the Small MS4 General Permit and that is consistent with *EPA New England Bacterial Source Tracking Protocol, Draft – January 2012* (a copy of which is attached as Appendix 1) as a reference. The IDDE Plan may include a distinct process for evaluation of infrastructure that serves both as part of the MS4 and part of the Combined Sewer System.

15. Within 60 Days of Approval by EPA of the IDDE Plan submitted in accordance with Paragraph 14, above, the City shall complete investigations of all Sub-catchment Areas south of Brook Street discharging to the Little River.

16. Within 180 Days of Approval by EPA of the IDDE Plan submitted in accordance with Paragraph 14, above, the City shall submit for review and Approval by EPA and to MassDEP for review:

a. A priority ranking of all Sub-catchment Areas based on all information and data available, including any available monitoring results, consistent with Appendix 1;

b. An MS4 Sub-catchment Area map showing the revised ranking of each Sub-catchment Area;

c. A schedule for completion of investigations for all Sub-catchment Areas where all information and data available, including any available monitoring results, indicated the presence of illicit connections, which shall provide that:

i. investigations of the Sub-catchment Areas on the north side of and discharging to the Merrimack River from Comeau Bridge to Mill Street remaining after completion of the investigations required by Paragraph 15 above will be completed within 240 Days of commencement of the Sub-catchment Area investigations; and

ii. investigations of all Sub-catchment Areas discharging from the MS4 will be conducted according to the City's priority ranking order and will be completed within 5 years of the Effective Date.

C. MS4 Illicit Discharge Prohibition and Removal

17. Within 90 Days of the Effective Date, the City shall adopt an ordinance, bylaw, or other regulatory mechanism that prohibits non-stormwater discharges into the MS4, as required by Part II.B.3.(b) of the Small MS4 General Permit. Such ordinance, bylaw, or other regulatory mechanism, however, shall permit those discharges excepted by Part II.B.3. of the Small MS4 General Permit. Within 60 Days of the adoption of such ordinance, bylaw, or other regulatory mechanism, the City shall develop and submit for review and Approval by EPA and to MassDEP for review, a manual ("IDDE Enforcement Manual") to detect and address non-stormwater discharges into the MS4, as required by Part II.B.3.(c) of the Small MS4 General Permit.

18. Within 60 Days of the Effective Date, the City shall eliminate all sources verified (as defined in Paragraph 19 of this Consent Decree) as of the Effective Date known to be contributing any pollutant in the City's stormwater that exceeds any screening threshold

identified in the IDDE Plan; and in the event such date cannot be achieved, the City shall submit a schedule to both EPA and MassDEP to remove the illicit discharge as expeditiously as possible.

19. For purposes of this Consent Decree, the "Date of Verification" of an illicit discharge shall be the date on which the City has identified a point of entry from a specific location or address that is a source of unauthorized wastewater to the MS4 or unauthorized sanitary wastewater to the MS4. On such date, an illicit discharge shall be deemed to have been "verified."

20. The IDDE Enforcement Manual shall identify the specific and detailed procedures including enforcement actions that the City shall implement, and associated schedules and milestones to remove all illicit discharges on property owned by the City or a private property owner.

21. The IDDE Enforcement Manual shall require that an illicit discharge be removed within 60 Days of the Date of Verification; and in the event such date cannot be achieved, it shall require that the City initiate enforcement action to promptly require the removal of an illicit discharge, and concurrently submit a schedule to both EPA and MassDEP to remove the illicit discharge as expeditiously as possible.

22. The IDDE Enforcement Manual also shall require that the City perform post-removal sampling to verify the illicit discharge removal.

D. <u>SSOs & Building/Private Party Backups</u>

23. The City shall, consistent with its CMOM Program Document to be developed pursuant to Paragraph 29, below, implement operation and maintenance practices, enforce sewer

use ordinances, and manage the POTW's treatment plant to prevent SSO discharges. If SSOs and Building/Private Party Backups do occur, the City shall act to terminate the discharge as quickly as possible, and promptly mitigate impacts to public health and water resources.

24. The City shall report to EPA and MassDEP all SSOs and Building/Private Party Backups known to occur on or after the Effective Date caused by conditions in the Collection System. The City shall report every such SSO and Building/Private Party Backup event as soon as the City has knowledge of the event and no later than 24 hours after its occurrence or discovery by electronic mail to EPA and MassDEP (hilton.joy@epa.gov; kevin.brander@state.ma.us). The City shall tabulate and maintain a record of each such event in a central tracking database. The location of each SSO and Building/Private Party Backup shall be reflected on a map of the Collection System maintained by the City. Submittal of MassDEP's SSO/Bypass Reporting Form with the information requested within that form that is currently available at http://www.mass.gov/eea/docs/dep/water/approvals/year-thru-alpha/m-thru-s/ssoform.pdf will satisfy the 24-hour reporting requirement. Within 5 days of obtaining knowledge of the SSO or Building/Private Party Backup event, the City shall also provide for each SSO the additional information required below if it is not included on the MassDEP's SSO/Bypass Reporting Form:

a. The date and time that the event began and was discovered by, or reported to, the City and the date the event was stopped, or if it is continuing, a schedule for its termination;

b. The location, including nearest property address, of each such event;

c. The source of notification (property owner, field crew, police, etc.);

d.    The specific cause of the event, to the extent known, including but not limited to whether it was caused by debris, fats, oils, and grease, or root blockages; collapsed pipes; mechanical, electrical, or structural failures; hydraulic overloads; equipment failures; and/or vandalism;

e.    Whether the cause of the event was within, or related to, the publicly-owned portion of the Collection System or if related to privately-owned sewer laterals, sanitary sewer lines or other private facilities;

f.    The estimated gallons of wastewater released and the method used to estimate the volume;

g.    A clear statement of whether or not the release entered a stormwater catch basin or any other portion of the City's MS4.  If the release occurred to the ground or street, regardless of whether the discharge entered any portion of the MS4, the City shall provide the location and the distance to the nearest down gradient stormwater catch basin and the name of the receiving water to which the catch basin discharges;

h.    If the release did not enter a stormwater catch basin or any other portion of the City's MS4, provide a clear statement of whether the release did or did not enter any surface water.  If the release entered a surface water, the City shall include the name of the surface water and a description of the location where the release entered the surface water;

i.    The estimated gallons of wastewater discharged to the MS4 or surface water, and the method used to estimate the volume;

j.    The measures taken and the measures that will be taken to stop the overflow and decontaminate the area affected by the overflow;

k. The measures taken to prevent future overflows at the same location; and

l. The date the overflow was reported to EPA and MassDEP.

25. The reporting requirements set forth in Paragraph 24 do not relieve the City of its obligation to submit any other reports or information as required by Section IX (Compliance Reporting) or by federal, state, or local law, regulation, or permit. Notwithstanding the foregoing, the City may use reports generated to satisfy the requirements set forth in Paragraph 24 to the extent they satisfy such other obligations.

E. Capacity, Management, Operation and Maintenance Program Assessment

26. Within 180 Days of the Effective Date, the City shall submit to EPA and MassDEP for review an updated assessment of its Collection System capacity and its operation and maintenance practices (the "CMOM Program Self-Assessment"), in accordance with EPA's Guide for Evaluating Capacity, Management, Operation, and Maintenance (CMOM) Programs at Sanitary Sewer Collection Systems (EPA 305-B-05-002, January 2005) (a copy of which is attached as Appendix 2), to determine whether improvements are necessary in order to maintain the infrastructure of the Collection System and to prevent future SSOs and Building/Private Party Backups. As part of the CMOM Program Self-Assessment, the City shall complete the Wastewater Collection System CMOM Program Self-Assessment Checklist (the "CMOM Program Self-Assessment Checklist") (a copy of which is attached as Appendix 3), which is an EPA Region 1 modification of the checklist that accompanies the guidance in Appendix 2.

F. Capacity, Management, Operation, and Maintenance Corrective Action Plan

27. By January 31, 2017, the City shall submit for review and Approval by EPA, and to MassDEP for review, a capacity, management, operation, and maintenance corrective action plan (the "CMOM Corrective Action Plan") that shall include the following:

a. A list of any deficiencies identified by the CMOM Program Self-Assessment;

b. A list of causes and contributing factors that led to the SSOs and Building/Private Party Backups as identified in the CMOM Program Self-Assessment Checklist;

c. A description of the specific short- and long-term actions that the City is taking, or plans to take, to address the deficiencies identified in the CMOM Program Self-Assessment Checklist; and

d. A schedule for implementation of the CMOM Corrective Action Plan.

28. Upon Approval by EPA, the City shall implement the CMOM Corrective Action Plan, as Approved by EPA, in accordance with the schedule set forth therein.

G. Capacity, Management, Operation, and Maintenance Program Document

29. Pursuant to the schedule set forth in the CMOM Corrective Action Plan, as Approved by EPA, the City shall consolidate all of its Collection System preventative and reactive maintenance programs and capital improvement plans into an updated separate, single capacity, management, operation, and maintenance program document (the "CMOM Program Document"). The CMOM Program Document shall be maintained at a location that is readily accessible to the City's maintenance staff and construction staff, and will be made available for inspection by EPA and MassDEP. This provision will not restrict the ability of the City to

continue preparing and producing a separate capital improvement plan required for annual planning and reporting purposes beyond the scope of this Consent Decree.

H. Emergency Response Plan

30. Within 90 Days of the Effective Date, the City shall develop and submit for Approval by EPA and MassDEP an Emergency Response Plan. The City shall design the Emergency Response Plan as a reference guide for its employees to ensure that:

a. Should SSOs or Building/Private Party Backups occur, the City minimizes the volume of untreated wastewater discharged to the waters of the United States and the impact of the discharge to the environment and on public health;

b. the City responds to and halts all SSOs and Building/Private Party Backups as rapidly as possible;

c. the City employs appropriate mitigation measures; and

d. the City implements appropriate measures to prevent recurrence of SSOs and Building/Private Party Backups at the same location.

31. The Emergency Response Plan shall set forth procedures for responding to SSOs and Building/Private Party Backups to minimize the environmental impact and potential human health risk. The Emergency Response Plan shall include, at a minimum:

a. Procedures to make the public aware of SSOs and measures to prevent public access to, and contact with, areas affected by SSOs and Building/Private Party Backups;

b. Procedures to provide timely notice of SSOs and Building/Private Party Backups to EPA, MassDEP, Massachusetts Division of Marine Fisheries, and local public health officials;

c. An emergency 24-hour telephone number that can be used by the public to report SSOs and Building/Private Party Backups;

d. An annual review of the City's equipment to ensure availability of the equipment necessary to respond to SSOs and Building/Private Party Backups, and to implement the Emergency Response Plan;

e. Procedures to ensure the rapid dispatch of personnel and equipment to correct, to repair or to mitigate the condition causing or contributing to any SSO or Building/Private Party Backup;

f. Procedures to ensure the preparedness, including responsiveness training, of the City's employees and contractors necessary for effective implementation of the Emergency Response Plan;

g. A system to track SSO and Building/Private Party Backup reports and other complaints and related repairs, and to investigate the causes of any SSOs or Building/Private Party Backups;

h. Formal safety training relevant to SSO and Building/Private Party Backup response for all Collection System maintenance personnel;

i. Procedures to ensure that the City will respond to and halt or contain SSOs and Building/Private Party Backups as soon as reasonably practicable;

j. Procedures to provide information to residents experiencing Building/Private Property Backups resulting from blockages and surcharges of the Collection System regarding prevention, clean up, and disposal of wastewater pumped from buildings;

k. Procedures for investigating and documenting the causes of Building/Private Property Backups resulting from blockages of or surcharges from the Collection System; and

l. A method and schedule, with respect to SSOs and Building/Private Party Backups: (i) to publicize on local cable television, local newspapers, and on the City's internet site the importance of promptly reporting SSOs and Building/Private Party Backups, and information regarding how to report them to a single point of contact within the City; and (ii) for the City, in turn, to report SSOs and Building/Private Party Backups to EPA and MassDEP, in accordance with the requirements set forth in Section VII of this Consent Decree.

32. Upon Approval by EPA and MassDEP, the City shall immediately and continuously implement the Emergency Response Plan, as Approved by EPA and MassDEP.

I. Geographic Information System ("GIS") Map

33. Within 365 Days of the Effective Date, the City shall submit to EPA and MassDEP for review and comment the best available GIS or other digital mapping of the MS4 and the Collection System to facilitate the development and implementation of its IDDE Plan and CMOM Corrective Action Plan. The City shall submit updated maps for review and comment by EPA and MassDEP with the Compliance Reports required pursuant to Section IX (Compliance Reporting), or upon request by EPA or MassDEP. Such mapping shall provide a comprehensive depiction of key infrastructure and factors influencing Collection System operation. Mapping themes shall include: key sanitary and storm sewer infrastructure; monitoring data; impervious surface area; cleaning and repair activities; capital projects; water resource and topographic features; land owned by the City and, based on the best available

existing information, land owned by other governmental entities. The scale and detail of the maps shall be appropriate to facilitate understanding of the MS4 and the Collection System by the City, EPA, and MassDEP. In addition, the mapping shall serve as a planning tool for the City to include: the implementation and phasing of the IDDE and CMOM Corrective Action Plans; and the demonstration of the extent of completed and planned IDDE investigations and corrections. To ensure legible mapping, information shall be (i) grouped appropriately and represented thematically (*e.g.*, by color) with legends or schedules where possible, (ii) updated periodically; and (iii) reportable or available upon request. The following information and features shall be included or, where specified below, made available when needed as part of detailed investigations to be included in the GIS or other digital mapping:

a. <u>Infrastructure</u>

- MS4 (including inter-municipal and private connections where available and applicable);
- Municipal sanitary sewer system (including inter-municipal connections);
- Municipal Combined Sewer System;
- Thematic representation of sewer material, size, and age;
- Sewer flow direction and flow type (*e.g.*, pressure or gravity);
- Vertical separation between systems;
- Aerial delineations of major separate storm sewer catchment areas, sanitary Sewersheds, combined Sewersheds, and areas served by known private on-site subsurface disposal systems (*e.g.*, septic systems);
- Common/twin-invert manholes or structures (*e.g.*, structures serving or housing both separate storm and sanitary sewers);

- Sanitary and storm sewer alignments served by known or suspected underdrain systems;
- Sewer alignments with common trench construction and major crossings representing high potential for communication due to water table influence;
- Lift stations (public and known private), siphons, and other key sewer appurtenances; and
- Location(s) of known or reported SSOs and Building/Private Party Backups.

b. <u>Water Resources and Topographic Features</u>

- Water bodies and watercourses identified by name;
- Water table elevations impacting sanitary sewer alignments;
- Topography; and
- Orthophotography.

c. <u>Operation and Maintenance, Investigations, Remediation, and Capital Projects</u>

- Alignments, dates, and thematic representation of work completed (with legend) of past illicit discharge investigations (*e.g.*, flow isolation, dye testing, closed-circuit television);
- Locations of suspected, confirmed, and corrected illicit discharges (with dates and flow estimates);
- Water quality monitoring locations with representation of water quality indicator concentrations;
- Recent and planned sewer and storm drainage infrastructure cleaning and repair projects;
- Planned capital improvement projects relating to sewer and storm drainage infrastructure;
- Alignments and dates of past and planned Infiltration/Inflow investigations and sanitary sewer remediation work; and
- Proposed annual planning of future illicit discharge investigations.

34. The City shall update the mapping on a continual basis as it implements the requirements of this Consent Decree, as necessary, to reflect newly-discovered information, corrections or modifications, and remedial measures performed by the City in compliance with this Consent Decree.

J. Construction Site Stormwater

35. Within 365 Days of the Effective Date, the City shall require sediment and erosion control at Construction Sites through an ordinance or other regulatory mechanism as required by Part II.B.4.(a) of the Small MS4 General Permit.

36. Within 365 Days of the Effective Date, the City shall develop and submit for review and Approval by EPA a Construction Site program that addresses the requirements of Part II.B.4. of the Small MS4 General Permit, including but not limited to inspection procedures, enforcement procedures, and recordkeeping.

37. The City's Construction Site program shall require developers to demonstrate that they have applied for EPA's Construction General Permit, where applicable, and shall require the use and maintenance of appropriate structural and non-structural BMPs designed to minimize the discharge of pollutants from Construction Sites to the MS4.

38. Within 60 Days of receipt of the Approval by EPA of the Construction Site program submitted in accordance with Paragraph 36 and revised to be consistent with EPA's comments, if any, the City shall implement the Construction Site program.

39. Within 60 Days of receipt of the Approval by EPA of the Construction Site program submitted in accordance with Paragraph 36 and revised to be consistent with EPA's

comments, if any, the City shall develop a database, incorporating the data elements described in

the Construction Site program submittal Approved by EPA, to track active Construction Sites.

40.     Within 365 Days of the Effective Date, the City shall have conducted at least one

inspection of each active Construction Site known to the City as of the Effective Date that has

the potential to discharge to the MS4.  The City shall inspect all new Construction Sites within

the first three weeks after the start of work at the Construction Site.

41.     Within 60 Days of receipt of the Approval by EPA of the Construction Site

program submitted in accordance with Paragraph 36 and revised to be consistent with EPA's

comments, if any, the City shall conduct training regarding Construction Site stormwater runoff

control for City personnel responsible for implementing the City's Construction Site program.

The City shall train all personnel performing Construction Site inspections within thirty (30)

Days of their commencing employment or assignment to perform said inspections.

42.     Within 60 Days of receipt of the Approval by EPA of the Construction Site

program submitted in accordance with Paragraph 36 and revised to be consistent with EPA's

comments, if any, the City shall develop, commence, and thereafter continue implementation of

procedures for site plan review including consideration of potential water quality impacts from

construction activities, *e.g.*, through review of a Stormwater Pollution Prevention Plan.

43.     Within 60 Days of receipt of the Approval by EPA of the Construction Site

program submitted in accordance with Paragraph 36 and revised to be consistent with EPA's

comments, if any, the City shall develop a plan with appropriate municipal agencies to ensure

notification to appropriate building permit applicants of their potential responsibilities under the

NPDES permitting program for Construction Site runoff as required by Part II.B.4. of the Small MS4 General Permit.

K. Post-Construction Stormwater Controls

44. Within 365 Days of the Effective Date, the City shall require management of stormwater runoff at post-construction development and redevelopment projects through an ordinance or other regulatory mechanism as required by Part II.B.5. of the Small MS4 General Permit.

L. POTW's Treatment Plant Planning and Improvements

45. The City shall not allow any Bypass to occur unless:

a. the Bypass is for essential maintenance to assure efficient operation and does not cause effluent limitations to be exceeded; or

b. (i) the Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

(ii) there were no feasible alternatives to the Bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a Bypass which occurred during normal periods of equipment downtime or preventative maintenance; and

(iii) The City submitted notices as required under Part II.B.4.c. of the POTW Permit; or

c. For any Bypass occurring prior to approval of a new High Flow Management Plan prepared pursuant to Paragraph 48.g. being Approved by EPA and MassDEP, the City complies with following:

i. During wet-weather events and significant snow melt, the City shall process as much flow through the POTW's treatment plant as practicable prior to initiating a bypass. The flow through the secondary treatment facilities (aeration and clarification) shall be maximized. The City shall provide primary treatment to the practical limit of the primary facilities.

ii. The City is not required to include biochemical oxygen demand and total suspended solids data from days with CSO-related bypass events when calculating average monthly percent removal of these pollutants. During the CSO-related bypass events, the blended final effluent samples shall be collected below the outfall junction chamber and shall achieve the outfall 046 effluent limitations set forth in the POTW Permit.

46. By June 30, 2016, the City shall upgrade the POTW's treatment plant sludge dewatering equipment in accordance with the design plans approved by MassDEP by letter of December 29, 2014, a copy of which approval letter is attached hereto as Appendix 7.

47. By June 30, 2016, the City shall submit an updated Operation and Maintenance Manual for the POTW's treatment plant, that shall include all elements set forth in 314 CMR 12.04(1), and shall include operation and maintenance information for the new sludge dewatering equipment.

48. By January 31, 2017, the City shall submit for Approval by EPA and MassDEP a Comprehensive Plant Evaluation ("CPE") assessing the capital and operational improvements necessary to maintain compliance with the POTW Permit. The CPE shall include, at a minimum:

a. A description of each element of each of the treatment units;

b. An analysis of the compliance history of the POTW's treatment plant relative to the effluent limits included in the POTW Permit;

c. An assessment of the physical condition, hydraulic and pollutant loading capacity, and operational performance of each of the treatment units;

d. An assessment of the measures needed to optimize, repair and/or replace treatment units and ancillary equipment so that the POTW treatment plant will reliably accept, treat, and discharge treated effluent in accordance with the POTW Permit over a planning period of 20 years;

e. Assessment of the POTW treatment plant building systems, including structures, roofs, electrical and instrumentation systems, plumbing and heating systems, HVAC systems, safety equipment and monitors, and alarm systems;

f. A review and assessment of the POTW's treatment plant operations, including the number of staff and organizational structure, and recommendations for appropriate modifications;

g. A review and update of the City's High Flow Management Plan to provide, in detail, recommended operational practices to optimize treatment efficiency and

minimize CSO discharges during high flow events related to wet weather and significant snow melt;

h. A review and update of the City's Operation and Maintenance Program for the POTW's treatment plant to identify alternatives for controlling plant operations, including at a minimum, the use of constant mixed liquor suspended solids, constant food/mass ratios, and constant mean cell residence time; and

i. An implementation schedule for all recommended optimization projects, capital improvements, and operational/staffing changes.

M. CSO Monitoring

49. As of April 9, 2014, the City began continuous electronic monitoring of each of its active CSO outfalls in order to record the date and time when flow from each outfall commences, the date and time when such flows cease, and the total volume released during each activation. Outfalls 024, 021E, 021D, 021A, 013, 032, and 034 shall be equipped with permanent meters until such time as the CSO outfalls are closed. Outfalls 021H, 021G, 038, 037, 021F, 021B, 019, 039, 040, and 041 shall be equipped with metering for a minimum period of one year from the date the meters are deployed and operating properly.

50. Commencing on the Effective Date, the City shall submit email notification within 24 hours of any CSO discharge to MassDEP, EPA, the Merrimack River Watershed Council, MA Division of Marine Fisheries, and Boards of Health agents for downstream communities, advising them of the discharge, and shall continue to issue email notification on successive days unless and until the discharges have ceased. The email notification shall, at a minimum, include identification of the CSO outfall which activated, and a map showing the

location of the City's CSO outfalls. The email notifications distributed pursuant to this Paragraph will be sent to the parties and other persons listed with their email addresses on Appendix 4, attached hereto.

51. By the 30th Day of April following the Effective Date and annually thereafter**,** the City shall submit a CSO activation report to EPA and MassDEP reporting on CSO activations that occurred during the previous twelve months. Each report shall include, for each activation at each CSO outfall, the date and time when flow commenced, the date and time when such flows ceased, the amount of precipitation associated with each event, and the total volume released during each activation. Each CSO activation report shall also include the total volumes discharged from each outfall and the total volume discharged through CSO outfalls from the Collection System during the reporting period.

N. CSO Planning and Plan Implementation

52. Within 30 Days of the Effective Date, the City shall raise CSO regulator weirs, as recommended in the City's July 2011 Phase II Long-Term CSO Control Plan, and further described in the City's June 17, 2013 correspondence to EPA and MassDEP (a copy of which is attached as Appendix 5), to further minimize CSOs at the Lower Siphon, Upper Siphon, Locke Street North, Locke Street South, and Bradford Avenue outfalls. Within 30 Days of the completion of each weir modification, the City shall notify EPA and MassDEP in writing of the completion of such work.

53. Within 60 Days of the Effective Date, the City shall complete investigations of the Bethany Avenue CSO discharging to the Merrimack River.

54. On or before March 31, 2017, the City shall complete all the remaining work in the System Maximization & Wet Weather Maximization Plan (Table 2) included as part of Appendix 5.

55. On or before January 31, 2017, the City shall submit for review and Approval by EPA and MassDEP a Final CSO Long-Term Control Plan ("FLTCP"). The FLTCP shall address comments from EPA and MassDEP on the July 2011 Phase II CSO Long-Term Control Plan (a copy of these comments is attached as Appendix 6), and shall specifically include:

a. An updated characterization of the Collection System that includes a description of the physical characteristics and attributes of the City's sewer system tributary to the POTW's treatment plant. The description shall be compiled from existing records with field confirmation of pipe and appurtenance characteristics, and as necessary, data shall be collected to augment existing records to produce a complete and accurate description of those portions of the Collection System to be modeled and mapped. Pipe characteristics shall include diameter, shape, length, slope, elevation and interior surface condition (*i.e.*, representative friction coefficients). Appurtenance characteristics shall include shape, size, elevation, interior condition and capacity as appropriate.

b. A description of how the Collection System and the POTW's treatment plant respond to a range of precipitation events by identifying the frequency and volumes of overflow discharged from each discharge point. Quantification of I/I from the components of the Collection System with separate sewer and drain systems shall be done as an element of this work.

c. A description and summary of the City's I/I control program, which shall include a summary of studies and assessment work planned or completed; a summary of rehabilitation or other I/I removal construction work completed to date; and a description of the City's practices in permitting new connections to the sewer system, and any associated I/I mitigation requirements.

d. A Final Alternatives Analysis in accordance with EPA's April 19, 1994 CSO Control Policy, published at 59 Fed. Reg. 18,688, to identify, screen, develop and evaluate alternatives that shall provide for measures necessary to ensure that CSOs from all CSO outfalls comply with the technology-based and water quality-based requirements of the CWA, the Massachusetts Act, and the POTW Permit. The City shall screen an appropriate range of technologies for eliminating, reducing, or treating CSOs, including alternatives that will reduce the number of untreated CSOs down to a range of overflows per CSO outfall per year (such as 0, 1 to 3, and 4 to 7).

e. A description of the CSO control measures the City proposes to implement to comply with the POTW Permit, including the construction of all Collection System and POTW treatment plant improvements necessary to ensure compliance with water quality standards, and a proposed schedule for constructing those control measures. The work must also include measures to address Excessive I/I into the areas of the Collection System that have separate sewer systems. The City also shall consider GI/LID alternatives in preparing the FLTCP. The FLTCP shall reflect the following activities and/or considerations in proposing GI/LID alternatives to traditional gray (traditional wastewater infrastructure) controls:

(1) identification of potential locations for GI/LID; (2) pilot projects; (3) design criteria; and (4) post-construction monitoring.

f. A financial impact analysis that, at a minimum, includes the methodology specified in EPA's February 1997 "Combined Sewer Overflows – Guidance for Financial Capability Assessment and Schedule Development [Final]." In addition to using such methodology, the City may submit an additional analysis using alternative inputs that the City contends produce a more accurate calculation of financial impact, provided that such inputs are consistent with EPA guidance, including the methodology specified in EPA's November 24, 2014 guidance "Financial Capability Assessment Framework for Municipal Clean Water Act Requirements."

g. A post-construction monitoring program which will result in the assessment of the effectiveness of the completed CSO control measures for CSO outfalls that are not eliminated. This program shall be consistent with EPA's May 2012 guidance, "CSO Post Construction Compliance Monitoring Guidance." The post-construction monitoring program shall include recommendations for metering all of the City's active CSOs.

56. Upon Approval by EPA and MassDEP of the FLTCP and an implementation schedule for the recommended plan, the City shall construct the CSO control measures Approved by EPA and MassDEP in accordance with the schedule Approved by EPA and MassDEP. The schedule shall be deemed incorporated into this Consent Decree upon its Approval by EPA and MassDEP.

## VIII. SUPPLEMENTAL ENVIRONMENTAL PROJECT

57. The City shall implement a Supplemental Environmental Project ("SEP") consisting of the Merrimack Riverbank Restoration Program as set forth in Appendix 8. The SEP shall be completed in accordance with the schedule set forth in Appendix 8.

58. The City is responsible for the satisfactory completion of the SEP in accordance with the requirements of this Consent Decree. "Satisfactory completion" means fulfilling the requirements described in Appendix 8. The City may use contractors or consultants in planning and implementing the SEP.

59. With regard to the SEP, the City certifies the truth and accuracy of each of the following:

a. That all cost information provided to EPA in connection with the Approval by EPA of the SEP is complete and accurate and that the City in good faith estimates that the cost to implement the SEP is at least $176,000;

b. That, as of the date of executing this Consent Decree, the City is not required to perform or develop the SEP by any federal, state, or local law or regulation and is not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum;

c. That the SEP is not a project that the City was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Consent Decree;

d. That the City has not received and will not receive credit for the SEP in any other enforcement action; and

e. That the City will not receive any reimbursement for any portion of the SEP from any other person.

60. Within 30 Days after the date of completion of the SEP, the City shall submit a SEP Completion Report for review and Approval by EPA and to MassDEP for review in accordance with Section XV of this Consent Decree (Form of Notice). The SEP Completion Report shall contain the following information:

a. a detailed description of the SEP as implemented;

b. a description of any problems encountered in completing the SEP and the solutions thereto;

c. an itemized list of all eligible SEP costs expended;

d. certification that the SEP has been fully implemented pursuant to the provisions of this Consent Decree; and

e. a description of the environmental and public health benefits resulting from implementation of the SEP (with a qualification of the benefits and pollutant reductions, if feasible).

61. EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph in order to evaluate the SEP Completion Report.

62. After receiving the SEP Completion Report, EPA shall notify the City in writing whether or not the City has satisfactorily completed the SEP. If the City has not completed the SEP in accordance with this Consent Decree, stipulated penalties may be assessed under Section XI of this Consent Decree (Stipulated Penalties).

63. Disputes concerning the satisfactory performance of the SEP and the amount of eligible SEP costs may be resolved under Section XIII of this Consent Decree (Dispute Resolution).

64. Each submission required under this Section shall be signed by a City officer with knowledge of the SEP and shall bear the certification language set forth in Paragraph 99.

65. Any public statement, oral or written, in print, film, or other media, made by the City making reference to the SEP implemented in accordance with this Consent Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, *United States of America and Commonwealth of Massachusetts v. the City of Haverhill, Massachusetts,* taken on behalf of the U.S. Environmental Protection Agency under the federal Clean Water Act and the Massachusetts Department of Environmental Protection under the state Clean Waters Act."

66. The City certifies that it is not a party to any open federal financial assistance transaction that is funding or could be used to fund the same activity as the SEP. The City further certifies that, to the best of its knowledge and belief after reasonable inquiry, there is no such open federal financial transaction that is funding or could be used to fund the same activity as the SEP, nor has the same activity been described in an unsuccessful federal financial assistance transaction proposal submitted to EPA within two years of the date of this settlement (unless the project was barred from funding as statutorily ineligible). For the purposes of this certification, the term "open federal financial assistance transaction" refers to a grant, cooperative agreement, loan, federally-guaranteed loan guarantee, or other mechanism for providing federal financial assistance whose performance period has not yet expired.

## IX. COMPLIANCE REPORTING

67. Within 180 Days of or the initial April 30 following the Effective Date, and each 180 Days thereafter through complete termination of this Consent Decree, the City shall submit to EPA and MassDEP, for review and comment, a compliance report (the "Compliance Report") for the previous six-month period, each such period a "Reporting Period." Except for the reporting elements in this Paragraph associated with the requirements of any sub-section(s) of Section VII (Remedial Measures) that has (have) been terminated in accordance with the partial termination provisions of Section XXIII (Termination), each Compliance Report shall include the following:

a. IDDE Program.

i. The current revised priority listing for all Sub-catchment Areas and all outfall monitoring data collected pursuant to sub-sections VII.A. and VII.B., above, during the Reporting Period;

ii. A spreadsheet detailing the percentage of each Sub-catchment Area investigation completed during the Reporting Period and cumulative to date based on the following:

1. the number of stormwater manholes in the Sub-catchment Areas that have been systematically investigated and addressed in accordance with the City's revised IDDE Plan, as Approved by EPA and MassDEP, during the Reporting Period and cumulative to date;

2. the percentage of the Sub-catchment Areas that have been systematically investigated and addressed in accordance with the City's revised

IDDE Plan, as Approved by EPA and MassDEP, during the Reporting Period and

cumulative to date.  The percentage shall be based on the number of stormwater

manholes addressed during each respective period divided by the total number of

stormwater manholes in the Sub-catchment Areas;

   3.   the linear feet of storm drain piping in the Sub-catchment

Areas that have been systematically investigated and addressed in accordance

with the City's revised IDDE Plan, as Approved by EPA, during the Reporting

Period and cumulative to date;

   4.   the percentage of the Sub-catchment Areas that have been

systematically investigated and addressed in accordance with the City's revised

IDDE Plan, as Approved by EPA, during the Reporting Period and cumulative to

date.  The percentage shall be based on the linear feet of storm drain addressed

during each respective period divided by the total linear feet in the Sub-catchment

Areas;

   iii.   An updated listing of all illicit discharges (separately listing illicit

connections and sanitary sewer defects) verified through the end of the Reporting Period,

including the following:

   1.   the date the illicit discharge was verified, the address or

location of the illicit discharge, and the type of discharge (*e.g.*, single-family

residential, multi-family residential, commercial, industrial, exfiltration from

sanitary sewer);

   2.   the estimated flow from the illicit discharge;

3. the actions taken by the City to remove the illicit discharge;

4. the date the illicit discharge was removed;

5. the cost of removing the illicit discharge;

6. an estimate of the resulting volume removed from the MS4 under the IDDE Plan during the Reporting Period for each individual illicit discharge and each Sub-catchment Area, cumulative for the Reporting Period, and cumulative for all illicit discharges verified to date;

7. a listing of those illicit discharges verified but not removed within 60 Days of verification, with an explanation of why each outfall was not removed within 60 Days of the Date of Verification;

8. the schedule for the removal of each illicit discharge that was not removed within 60 Days of the Date of Verification and an explanation as to why the schedule is as expeditious as possible;

9. for each verified illicit discharge that is the responsibility of the property owner where the property owner has not removed the illicit discharge within 90 Days of the Date of Verification, or within 90 Days of the Effective Date for existing verified illicit discharges, a complete and accurate description of the legal actions taken by the City to address them; and

10. for each schedule listed in the report for the previous Reporting Period, specify whether the City complied with its schedule for removal; and if not, the reasons for the delay.

b. SSO and Building/Private Party Backup Events.

i. A chronological list of each of the following categories of SSO and Building/Private Party Backup events that occurred during the Reporting Period: all releases with a reasonable potential to reach surface waters such as releases to streets or areas with storm drain catch basins; and citizen reports of SSO and Building/Private Party Backup events.

ii. A GIS map or figure, consistent with the requirements of Paragraph 33, above, indicating the location of each illicit discharge, SSO event, and Building/Private Property Backup;

c. Construction Site Inspection and Enforcement Program. A chart showing the numbers of routine, complaint-response, and total Construction Site inspections and the number of each type of enforcement action taken during the Reporting Period for violations of the City's ordinance or other regulatory mechanism requiring sediment and erosion control at Construction Sites;

d. General Status.

i. A description of the activities undertaken during the Reporting Period directed at achieving compliance with this Consent Decree;

ii. An identification of all plans, reports, and other submissions required by this Consent Decree that the City completed and submitted during the Reporting Period, and copies of records developed during the Reporting Period, including Computerized Maintenance Management System work orders, in connection with the outfall inspections and monitoring required by sub-sections VII.A. and VII.B., above;

iii. An identification of any noncompliance with the requirements of this Consent Decree. If any noncompliance is reported, the notification shall include the following information:

1. a description of the noncompliance;

2. a description of any factors that tend to explain or mitigate the noncompliance;

3. a description of any actions taken or proposed by the City to comply with any lapsed requirements; and

4. the date by which the City will perform such proposed action; and

iv. A description of the activities the City plans to undertake during the six months following the Reporting Period in order to comply with this Consent Decree;

e. Bypass.

i. For each month during the previous six-month period in which a secondary treatment Bypass occurs at the POTW's treatment plant, a monthly chronological spreadsheet containing the following information for each Day a secondary treatment Bypass occurs:

1. The date(s) of the Bypass;

2. The date(s) when rainfall occurred, and the rainfall totals (inches);

3. The presence, or absence of snowmelt;

4. The total plant influent flow (MGD);

5. The total secondary treatment Bypass volume (MG);

6. The start/stop time for each Bypass event, and plant flows at both the start and stop of the Bypass event;

7. The type and number of unit operations and processes that went offline, and the reasons for each;

8. The total gallons of septage received on each Bypass event Day; and

9. During the time of Bypass, additional operations information, including: the influent and effluent total suspended solids; the mean cell residence time for each aeration tank; the sludge blanket depth in the secondary clarifiers; and the mixed liquor suspended solids in the aeration tanks.

ii. For each Bypass that occurs during the Reporting Period, submit charts developed in accordance with Item 6 of Appendix 5.

68. The reporting requirements set forth in this Section do not relieve the City of its obligation to submit any other reports or information as required by federal, state, or local law, regulation, or permit. Notwithstanding the foregoing, the City may use reports generated to satisfy the requirements set forth in this Section as part of its efforts to satisfy such other reporting obligations. EPA and MassDEP each reserves the right to require modifications to the above reporting requirements, subject to the City's right to dispute under Section XIII (Dispute Resolution).

X. APPROVAL OF SUBMISSIONS

69. After review of any plan, schedule, report, or other item that is required to be submitted for Approval by EPA or Approval by EPA and MassDEP pursuant to this Consent Decree, EPA and/or MassDEP as specified may, in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder, directing that the City modify the submission by itemizing and specifically identifying the deficiencies; or (d) disapprove the submission. In the event of Approval by EPA or Approval by EPA and MassDEP, pursuant to (a) or (b) of this Paragraph, the plan, schedule, report, or other item, or portion thereof, as approved, or approved with conditions, shall be enforceable under this Consent Decree, and the City shall take all actions required to implement such plan, schedule, report, or other item, or portion thereof, in accordance with the issued approval, or approval with conditions.

70. Upon receipt of a written notice of disapproval pursuant to Paragraph 69(c) or 69(d), subject to the City's right to dispute the disapproval under Section XIII (Dispute Resolution), the City shall, within 30 Days, or such other time as the City, EPA or EPA and MassDEP as appropriate agree in writing, correct the deficiencies and resubmit the plan, schedule, report, or other item, or portion thereof, for Approval by EPA or EPA and MassDEP. Any stipulated penalties applicable to the original submission shall accrue during the 30-Day period or other specified period, but shall not be payable unless the resubmission is untimely and/or disapproved as provided in Paragraph 71, below.

71. Any resubmitted plan, schedule, report, or other item, or portion thereof, shall be subject to review and Approval by EPA or EPA and MassDEP, as provided under this Section.

If the City fails to resubmit a plan, schedule, report, or other item, or portion thereof after a disapproval, or if, upon resubmission, the plan, schedule, report, or other item, or portion thereof, is disapproved by EPA or EPA and MassDEP, the City shall be deemed to have failed, as of the date of such document's resubmission, to submit such plan, schedule, report, or other item, or portion thereof, timely and adequately, unless the City invokes the dispute resolution procedures set forth in Section XIII (Dispute Resolution), herein, and the City's position is upheld.

## XI. STIPULATED PENALTIES

72. The City shall pay stipulated penalties to the United States and the Commonwealth for violations of, or noncompliance with, the requirements of this Consent Decree, as set forth below, unless excused under Section XII (Force Majeure), herein. A violation or noncompliance includes failing to perform an obligation required by the terms of this Consent Decree, including any plan or schedule approved under this Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules or by the date(s) established by or approved under this Consent Decree. If the United States or the Commonwealth makes a demand for stipulated penalties, the City may invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution).

a. Late Payment of Civil Penalty. If the City fails to pay the Civil Penalty required to be paid under Section VI (Civil Penalty), above, when due, the City shall pay, in addition to interest as specified in Paragraph 9, above, a stipulated penalty as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 10th Day |
| $1,500 | 11th through 20th Day |
| $2,500 | 21st Day and beyond. |

b. Reporting & Notice Requirements. For every Day that the City fails to timely submit a report required by Paragraph 67, above, fails to submit the SEP Completion Report required by Paragraph 60, above, fails to provide the certification required by Paragraph 99, below, or fails to provide the notice required by Paragraphs 4 and 5, above, the City shall pay a stipulated penalty as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 10th Day |
| $1,500 | 11th through 20th Day |
| $2,500 | 21st Day and beyond. |

c. Unpermitted Discharges. For each Day that an SSO occurs, the City shall pay a stipulated penalty of $6,500. Notwithstanding the foregoing, the City shall not be liable for such a stipulated penalty for an SSO if all of the following conditions are met: (i) the City stopped the SSO as soon as reasonably practicable; (ii) the City is in full compliance with and is fully implementing the schedules and other requirements set forth pursuant to Section VII of this Consent Decree; and (iii) the City has complied with all reporting requirements for said SSO, including but not limited to those set forth in Paragraph 24 of this Consent Decree.

d. Remedial Measures. For every Day that the City fails to timely meet the requirements of Section VII (Remedial Measures) of this Consent Decree, or is delayed in completing the SEP (Section VIII) for reasons other than Force Majeure circumstances, including but not limited to, submitting an approvable plan, schedule, report, or other item, other than a report required by Paragraph 67, above, or fails to implement remedial measures in accordance with a plan, schedule, report, or other item Approved by EPA and MassDEP, the City shall pay a stipulated penalty as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 10th Day |
| $1,000 | 11th through 20th Day |
| $2,500 | 21st Day and beyond |

e. If the City satisfactorily completes the SEP but spends less than approximately $176,000, the City shall be required to pay a stipulated penalty in the amount equal to the difference between $176,000 and the actual amount spent on the SEP.

f. If the City does not satisfactorily complete the SEP for reasons other than Force Majeure circumstances, the City shall pay a stipulated penalty of $220,000.

73. Stipulated penalties shall automatically begin to accrue on the Day after performance is due or on the Day a violation occurs and shall continue to accrue each Day until performance is satisfactorily completed or until the violation or noncompliance ceases. Stipulated penalties shall accrue simultaneously for separate violations of, or instances of non-compliance with, this Consent Decree.

74. Following the United States' or the Commonwealth's determination that the City has failed to comply with a requirement of this Consent Decree, the United States or the Commonwealth will give the City written notification of the same and describe the noncompliance. The United States or the Commonwealth will send the City a written demand for the payment of stipulated penalties. If the United States or the Commonwealth makes a demand for payment of stipulated penalties, it shall simultaneously send a copy of the demand to the other Plaintiff, as applicable. However, the stipulated penalties shall accrue as provided in the preceding Paragraph regardless of whether the United States or Commonwealth has notified the City of a violation of, or noncompliance with, the requirements of this Consent Decree, or demanded payment of stipulated penalties.

75. The City shall pay stipulated penalties as specified in this Section by delivering the payment to the United States and the Commonwealth within 45 Days of the date of a demand for payment of stipulated penalties by the United States or the Commonwealth. The City shall pay one half of the total stipulated penalty amount due to the United States and one half to the Commonwealth in the manner set forth and with the confirmation notices required by Paragraphs 10 and 11, above, except that the transmittal letters shall state that the payment is for stipulated penalties and shall state for which violation(s) or noncompliance the penalties are being paid. In the event the City fails to pay stipulated penalties according to the terms of this Consent Decree, such penalty (or portion thereof) shall be subject to interest at the statutory judgment rate set forth at 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the Commonwealth in seeking any remedy otherwise provided by law for the City's failure to pay any stipulated penalties.

76. Stipulated penalties shall continue to accrue as provided in Paragraph 73, above, during dispute resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement of the Parties, or by a decision of EPA and/or MassDEP that is not appealed to the Court, and such agreement involves the payment by the City of any penalty amount, the City shall pay accrued penalties, if any, together with interest, to the United States and the Commonwealth within 45 Days of the agreement or the receipt of the United States' or the Commonwealth's decision or order.

b. If the dispute is appealed to the Court and the United States or the United States and the Commonwealth prevail in whole or in part, the City shall pay all accrued penalties, together with interest, within 60 Days of receiving the Court's decision or order, to the extent the United States and the Commonwealth prevail, except as provided in subparagraph c., below.

c. If any Party appeals the Court's decision, and the United States or the United States and the Commonwealth prevail in whole or in part, the City shall pay all accrued penalties, together with interest, within 15 Days of receiving the final appellate court decision, to the extent the United States and the Commonwealth prevail.

77. The stipulated penalties set forth above shall be in addition to any other remedies, sanctions, or penalties which may be available by reason of the City's failure to comply with the requirements of this Consent Decree. The United States and the Commonwealth expressly reserve any and all legal and equitable remedies, including contempt sanctions, which may be available to enforce the provisions of this Consent Decree. The United States and the

Commonwealth may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree.

## XII. FORCE MAJEURE

78. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes entirely beyond the control of the City, its officers or agents, including the City's consultants, and contractors, that delays or prevents the timely performance of any obligation under this Consent Decree notwithstanding the City's best efforts to fulfill the obligation.

79. The requirement that the City exercise "best efforts" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring, and (b) after it has occurred, to prevent or minimize any resulting delay to the greatest extent feasible. Force Majeure does not include the City's financial inability to perform any obligation under this Consent Decree. Stipulated Penalties shall not be due for the number of Days of noncompliance caused by a Force Majeure event as defined in this Section, provided that the City complies with the terms of this Section. The City may seek relief under this Section for any delay in the performance of an obligation under this Consent Decree that results from a failure to obtain, or a delay in obtaining, any permit or approval, including Approval by EPA or Approval by EPA and MassDEP under this Consent Decree, required to fulfill such obligation, if the City has submitted timely and complete applications and has taken all other actions necessary to obtain such permits and approvals.

80. If any event occurs or has occurred that may delay or prevent the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, the

City shall notify EPA and MassDEP via email within three business Days after the City first knew or should have known that the event might cause a delay. Within five business Days, the City shall submit for review and Approval by EPA and MassDEP, at the addresses specified in Section XV (Form of Notice), below, a written explanation of the cause(s) of any actual or expected delay or noncompliance, the anticipated duration of any delay, the measure(s) taken and to be taken by the City to prevent or minimize the delay, a proposed schedule for the implementation of such measure(s), and a statement as to whether, in the opinion of the City, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Notwithstanding the foregoing, the City shall notify EPA and MassDEP orally as soon as practicable, and in any event within 24 hours of becoming aware of any event that presents an imminent threat to the public health or welfare or the environment and provide written notice to EPA and MassDEP within 72 hours of discovery of such event. Failure to provide timely and complete notice in accordance with this Paragraph shall constitute a waiver of any claim of Force Majeure with respect to the event in question. Notifications required by this Paragraph shall be provided consistent with the contact information provided in Section XV (Form of Notice), below. Nothing in this Consent Decree should be taken to change or amend existing reporting requirements established by MassDEP for SSO events and facility upsets.

81. If EPA and MassDEP agree that a delay or anticipated delay is attributable to Force Majeure, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event shall be extended by EPA and MassDEP for a period of time as EPA and MassDEP determine is necessary to complete these obligations. EPA and

MassDEP will notify the City in writing of the length of the extension for completion of the obligations affected by the Force Majeure event.

82.     If EPA and MassDEP do not agree the delay or anticipated delay is attributable to Force Majeure, or on the number of Days of noncompliance attributable to such event, EPA and MassDEP will notify the City in writing of the decision.  The City may then elect to initiate the dispute resolution process set forth in Section XIII (Dispute Resolution).  If the City does not initiate the dispute resolution process set forth in Section XIII (Dispute Resolution) within 10 Days of receiving a written notice under this Paragraph from either EPA or MassDEP, then the City shall be deemed to have waived any Force Majeure claims or any rights to initiate dispute resolution with regard to such claims.  In any dispute resolution proceeding, the City shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that "best efforts" were exercised to avoid and mitigate the effects of the delay, and that the City complied with the requirements of Paragraph 80, above.  If the City carries this burden, the delay at issue shall be deemed not to be a violation by the City of the affected obligation(s) of this Consent Decree.

83.     Delay in performance of any obligation under this Consent Decree shall not automatically justify or excuse delay in complying with any subsequent obligation or requirement of this Consent Decree.

84.     Failure of the City to obtain any state or federal grants or loans shall not be considered a Force Majeure event under this Consent Decree.

## XIII. DISPUTE RESOLUTION

85. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures set forth in this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. The City's failure to seek resolution of a dispute under this Section shall preclude the City from raising any such undisputed issue as a defense to an action by the United States or the Commonwealth to enforce any obligation of the City arising under this Consent Decree. The procedures set forth in this Section shall not apply to actions by the United States or the Commonwealth to enforce obligations that the City has not disputed in accordance with this Section.

86. Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when the City sends the United States and the Commonwealth a written Notice of Dispute which clearly identifies the matter in dispute. Within 10 Days thereafter, the City shall, unless the parties have resolved the matter in dispute, submit to the United States and the Commonwealth a Statement of Position that shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the City. As part of the informal negotiations, the Parties may engage in mediation with a third-party mediator in order to resolve the dispute, if all Parties mutually agree to such mediation. A Party's decision whether to mediate is not subject to dispute resolution. The period of informal negotiations (including mediation) shall not exceed 40 Days from the date written Notice of the Dispute is received by EPA, or EPA and MassDEP, as appropriate, unless that period is modified by written agreement between the Parties. EPA shall maintain an administrative record of the dispute,

which shall contain all statements of the Parties, including supporting documentation, submitted pursuant to this Section.

87. In the event that the City elects to invoke dispute resolution pursuant to this Section, the City shall do so by giving the United States and the Commonwealth written notice of the existence of the dispute within 10 Days after the occurrence of an event for which this Consent Decree provides for the invocation of dispute resolution. If the City fails to give such notice, it shall be deemed to have waived any right to invoke dispute resolution regarding such dispute, and the position advanced by the United States or the United States and the Commonwealth as appropriate shall be considered binding.

88. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by EPA, or EPA and MassDEP, as appropriate, shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, as extended by the agreement of the Parties, the City seeks judicial review of the dispute by filing with the Court and serving on the United States, or the United States and the Commonwealth, in accordance with Section XV (Form of Notice), below, a motion requesting judicial resolution of the dispute. Any such motion shall contain a written statement of the City's position on the matter in dispute, including any factual data, documentation, analysis or opinion related to the dispute, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

89. The United States, or the United States and the Commonwealth, as appropriate, shall respond to the City’s motion within the time period allowed by the Federal Rules of Civil

Procedure and the Local Rules of this Court. The City may file a reply memorandum, to the extent permitted by the Federal Rules of Civil Procedure and the Local Rules.

90. Standard of Review.

a. Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, any dispute brought under this Section pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules, or any other items requiring approval by EPA and/or MassDEP under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law; the City shall have the burden of demonstrating, based upon the administrative record, that the United States' or the United States' and the Commonwealth's positions are arbitrary and capricious or otherwise not in accordance with law.

b. Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under this Section, the City shall bear the burden of demonstrating that its position complies with this Consent Decree, furthers the objectives of this Consent Decree more positively than the position advanced by the United States and the Commonwealth, and that the City is entitled to relief under applicable principles of law.

91. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of the City under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 76, above. If

the City does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. RIGHT OF ENTRY/INFORMATION COLLECTION AND RETENTION

92. EPA and MassDEP and their contractors, consultants, and attorneys shall have authority to enter any property and/or facility owned or controlled by the City, at all reasonable times, upon proper identification, for the purposes of: (a) monitoring the progress of activity required by this Consent Decree; (b) verifying any data or information submitted to EPA or MassDEP under this Consent Decree; (c) assessing the City's compliance with this Consent Decree; (d) obtaining samples and, upon request, splits of any samples taken by the City or its contractors or consultants; and (e) obtaining documentary evidence, including photographs and similar data. Upon request, EPA and MassDEP shall provide the City splits of any samples taken by EPA or MassDEP.

93. Until five years after the complete termination of this Consent Decree, the City shall retain all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) generated by the City, and all data collected and all reports generated by the City’s consultants or contractors (including data and reports in electronic form), that relate in any manner to the City’s performance of its obligations under this Consent Decree. This information retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States or the Commonwealth, the City shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

94.     At the conclusion of the information-retention period provided in the preceding

Paragraph, the City shall notify the United States and the Commonwealth at least 90 Days prior

to the destruction of any documents, records, or other information subject to the requirements of

the preceding Paragraph and, upon request by the United States or the Commonwealth, the City

shall deliver any such documents, records, or other information to EPA or MassDEP.  The City

may assert that certain documents, records, or other information are privileged under the

attorney-client privilege or any other privilege recognized by federal law.  If the City asserts such

a privilege, it shall provide the following:  (a) the title of the document, record or information;

(b) the date of the document, record, or information; (c) the name and title of each author of the

document, record, or information; (d) the name and title of each addressee and recipient; (e) a

description of the subject of the document, record, or information; and (f) the privilege asserted

by the City.  However, no documents, records, data, reports or other information created or

generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of

privilege.

95.     This Consent Decree in no way limits or affects any right of entry and inspection,

or any right to obtain information, held by the United States or the Commonwealth pursuant to

applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or

obligation of the City to maintain documents, records, or other information imposed by

applicable federal or state laws, regulations, or permits.

## XV.    FORM OF NOTICE

96.     Unless otherwise specified herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing to the

following respective addressees. Any Party may, by written notice to the other Parties, change its designated notice recipient, address, or means of notice (including the substitution of electronic notice via email instead of notice via mail). Notifications, submissions, or communications submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by written agreement of the Parties.

As to the Department of Justice:

Chief, Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611 – Ben Franklin Station
Washington, DC 20044

As to the United States Attorney:

United States Attorney
District of Massachusetts
One Courthouse Way
John Joseph Moakley Courthouse
Boston, MA 02210
Attention: Susan Poswistilo

As to EPA:

Joy Hilton
Enforcement Officer
Water Technical Unit
U.S. Environmental Protection Agency, Region 1
5 Post Office Square – Suite 100
Mail Code OES04-4
Boston, MA 02109-3912
hilton.joy@epa.gov

Michael Wagner
Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency, Region 1
5 Post Office Square – Suite 100
Mail Code OES04-1
Boston, MA 02109-3912
wagner.michael@epa.gov

As to MassDEP:

Kevin Brander, P.E.
Section Chief
Wastewater Management Section
MassDEP/NERO
205B Lowell Street
Wilmington, MA 01887
kevin.brander@state.ma.us

As to the Office of the Massachusetts Attorney General:

I. Andrew Goldberg
Assistant Attorney General
Environmental Protection Division
Massachusetts Attorney General's Office
One Ashburton Place, 18th Flr.
Boston, MA 02108
andy.goldberg@state.ma.us

As to the City of Haverhill:

Office of the Mayor
City of Haverhill
City Hall, Room 100
Four Summer Street
Haverhill, MA 01830
Mayor@CityofHaverhill.com

Robert E. Ward
Deputy DPW Director
City of Haverhill
40 South Porter Street
Haverhill, MA 01835
rward@haverhillwater.com

William D. Cox, Jr.
City Solicitor
145 S. Main Street
Haverhill, MA 01835
billcoxlaw@aol.com

Michael A. Leon
Nutter McClennen & Fish LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
mleon@nutter.com

97. The City shall submit all notifications, submissions, and communications required by this Consent Decree to EPA via electronic mail no later than the due date(s) specified in this Consent Decree, in accordance with the terms of this Paragraph. The City shall provide complete copies to both Joy Hilton and Michael Wagner of all submissions and notices required to be made by the City to EPA pursuant to this Consent Decree; except that with respect to copies of reports, schedules, plans, and other items required pursuant to Sections VII (Remedial Measures) and VIII (Compliance Reporting), only copies of the transmittal letters need be provided to Michael Wagner. If a submission or notice cannot be provided via electronic mail due to its size, an electronic copy shall be provided by CD-ROM or other similar digital format.

98. The City shall provide complete copies to MassDEP of all notifications, submissions and communications required by this Consent Decree by electronic mail no later than the due date(s) specified in this Consent Decree. If a submission or notice cannot be provided via electronic mail due to its size, an electronic copy shall be provided by CD-ROM or other similar digital format. In addition, the City shall provide a single hard copy of all notifications, submissions, and communications to Kevin Brander.

99. All written reports or submissions required of the City by this Consent Decree shall contain the following certification signed by a duly authorized representative of the City:

> "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## XVI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

100. This Consent Decree resolves the civil claims of the United States and the Commonwealth for the violations alleged in their respective Complaints filed in this action through the Date of Lodging.

101. This Consent Decree is neither a permit nor a modification of any existing permit under any federal, state, or local law or regulation. The City is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws and regulations, and permits, and the City's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the Commonwealth do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that the City's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA or the Massachusetts Act or with any other provisions of federal, state, or local laws, regulations, or permits. This Consent Decree shall not be construed to constitute Approval by EPA or Approval by EPA and MassDEP of any equipment or technology installed by the City under the terms of this Consent Decree.

102. This Consent Decree does not limit any rights or remedies available to the United States or the Commonwealth for any violation by the City of the CWA, the Massachusetts Act, or associated regulations or permit conditions other than those claims alleged in the Complaints through the Date of Lodging. This Consent Decree does not limit any rights or remedies available to the United States or the Commonwealth for any criminal violations. The United States and the Commonwealth expressly reserve all rights and remedies, legal and equitable, available to each of them for all violations of the CWA, the Massachusetts Act, or other applicable law, except with respect to violations that have been specifically resolved pursuant to Paragraph 100, and reserve all rights and remedies, legal and equitable, available to enforce the provisions of this Consent Decree, including the provisions of any plan or schedule Approved by EPA or Approved by EPA and MassDEP under this Consent Decree. Nothing herein shall be construed to limit the power of the United States or the Commonwealth, consistent with their respective authorities, to undertake any action against any person, in response to conditions which may present an imminent and substantial endangerment to the public's health or welfare, or the environment.

103. In any subsequent administrative or judicial proceeding initiated by one or more of the United States and the Commonwealth for injunctive relief, civil penalties, or other appropriate relief relating to the City's violations of federal or state law, the City shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by one or more of the United States and the Commonwealth in the subsequent proceeding were or should have been brought in the instant

case, except with respect to claims that have been specifically resolved pursuant to Paragraph 100.

104. This Consent Decree does not resolve any claims for contingent liability under Section 309(e) of the Clean Water Act, 33 U.S.C. § 1319(e). The United States specifically reserves any such claims against the Commonwealth.

105. This Consent Decree does not limit or affect the rights of the City or the United States and the Commonwealth against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree against the City, except as otherwise provided by law.

106. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XVII. COSTS

107. Each Party shall bear its own expenses, costs, and attorneys' fees in this action. The City shall be responsible for all expenses, costs and attorneys' fees incurred by the United States or the Commonwealth in collecting any penalties due and payable under Sections VI (Civil Penalty) and XI (Stipulated Penalties) of this Consent Decree.

## XVIII. EFFECTIVE DATE

108. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XIX. RETENTION OF JURISDICTION

109. The Court shall retain jurisdiction to modify and enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree, and to assess any stipulated penalties that may have accrued pursuant to Section XI (Stipulated Penalties) of this Consent Decree.

## XX. MODIFICATION

110. The terms of this Consent Decree, including any modifications to any schedule specified in this Consent Decree or to any appendix, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court. Non-material changes to this Consent Decree (including appendices) may be made by written agreement of the Parties without court approval. In the event a dispute arises concerning modification of this Consent Decree, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b). Changes to names and addresses in Section XV (Form of Notice) may be accomplished by written notice to the other parties by the Party initiating the change.

111. It is the intention of the Parties to this Consent Decree that the City shall have the opportunity, consistent with applicable law, to conform compliance with this Consent Decree with any modification in EPA's regulations or national policies governing the frequency, volume and duration of discharges from the City's Combined Sewer System and Bypasses of secondary treatment at the POTW's treatment plant; to conform compliance with this Consent Decree with

any applicable new or revised water quality standards that have been approved or promulgated by EPA in accordance with 33 U.S.C. § 1313(c) and 40 C.F.R. §§ 131.21 and 131.22; and to conform compliance with this Consent Decree with any new or revised requirements, whether such requirements are more stringent or more lenient, that are included in the POTW Permit and the Small MS4 General Permit. Consequently, upon issuance of any new federal regulation (as promulgated in the Federal Register), whether such regulations are more stringent or more lenient than current federal law or regulation or national policy governing the frequency, volume and duration of discharges from the City's Combined Sewer System and bypasses of secondary treatment at the POTW's treatment plant; upon EPA approval or promulgation of new or revised water quality standards in accordance with 33 U.S.C. § 1313(c) and 40 C.F.R. §§ 131.21 and 131.22; or upon the issuance of a permit that contains new or revised requirements, whether such requirements are more stringent or more lenient, pertaining to the POTW's treatment plant or Combined Sewer System, the City may request modification of this Consent Decree (including requests for extensions of time) to conform compliance with this Consent Decree with such regulation, national policy, new or revised water quality standard or permit. For purposes of this Paragraph, "national policy" refers to a formal written policy statement issued by the Assistant Administrator for the Office of Water and the Assistant Administrator for the Office of Enforcement and Compliance Assurance or their designees. Upon the City's request, EPA, MassDEP and the City shall discuss the matter. If the Parties agree on a proposed modification to this Consent Decree, they shall prepare a joint motion to the Court requesting such modification.

112.    If the Parties do not agree, and the City still believes that modification of this

Consent Decree is appropriate, the City may file a motion seeking such modification in

accordance with Federal Rule of Civil Procedure 60(b); provided, however, that nothing in this

subparagraph is intended to waive the United States' or the Commonwealth's rights to oppose

such motion and to argue that such modification is unwarranted.

113.    Following the filing of a motion under Rule 60(b), stipulated penalties shall

accrue due to the City's failure, if any, to continue performance of obligations under this Consent

Decree that are necessarily the subject of the Rule 60(b) motion; provided, however, that such

penalties need not be paid unless the Court resolves the motion in the United States' or the

United States' and Commonwealth's favor.  If the Court resolves the motion in the City's favor,

the City shall comply with this Consent Decree as modified.

## XXI.    FUNDING

114.    Performance of the terms of this Consent Decree by the City is not conditioned on

the receipt of any federal or state grant funds or loans, or other financing.  In addition,

performance is not excused by the lack of federal or state grant funds or loans.

## XXII.    SEVERABILITY

115.    The provisions of this Consent Decree shall be severable, and should any

provision be declared by the Court to be unenforceable, the remaining provisions shall remain in

full force and effect.

## XXIII.    TERMINATION

116.    After the City completes all of the requirements of sub-sections "A" through "L"

of Section VII (Remedial Measures) (such sub-sections are designated with capitalized letters),

complies with all other requirements of this Consent Decree, has paid in full the Civil Penalty,

and all accrued interest thereon, if any, and all stipulated penalties, if any, and all accrued interest

thereon, if any, as required by Sections VI (Civil Penalty) and XI (Stipulated Penalties) of this

Consent Decree, and has paid in full the costs of litigation, and all accrued interest thereon, as

required by Paragraph 107 of this Consent Decree, the City may serve upon the United States

and the Commonwealth a Request for Partial Termination, stating that the City has satisfied

those requirements, together with all applicable supporting documentation.

117.    On or after June 1, 2031, if the City has completed all of the requirements of

Section VII (Remedial Measures) through that date, has satisfactorily maintained continuous

satisfactory compliance with those and all other requirements of this Consent Decree and the

POTW Permit and the Small MS4 General Permit for a period of one year, has paid in full the

Civil Penalty, and all accrued interest thereon, if any, and all stipulated penalties accrued to date,

if any, and all accrued interest thereon, if any, as required by Sections VI (Civil Penalty) and XI

(Stipulated Penalties) of this Consent Decree, has paid in full the costs of litigation, and all

accrued interest thereon, as required by Paragraph 107 of this Consent Decree, and has fulfilled

its obligations required by Section VIII (Supplemental Environmental Project) of this Consent

Decree, the City may serve upon the United States and the Commonwealth a Request for

Complete Termination, stating that the City has satisfied those requirements, together with all

applicable supporting documentation.

118.    Following receipt by the United States and the Commonwealth of any City

Request for Termination, whether a Request for Partial Termination or Request for Complete

Termination, the Parties shall confer informally concerning the Request for Termination and any

disagreement that they may have as to whether the City has satisfied the requirements for a partial or complete termination of this Consent Decree. The United States and the Commonwealth shall consult as to whether the City has satisfied the requirements for termination contained in Paragraphs 116 or 117 above. If after consultation, the Parties agree that this Consent Decree may be terminated, in part or in whole, the Parties shall submit, for the Court's approval, a joint stipulation terminating, if partial, the referenced sub-section(s) or, if complete, this Consent Decree.

119. If the United States and the Commonwealth do not agree that this Consent Decree may be terminated in part or in full, the City may invoke dispute resolution under Section XIII (Dispute Resolution). However, the City shall not seek dispute resolution of any dispute regarding termination until 60 Days after service of its Request for Termination.

## XXIV. FINAL JUDGMENT

120. Entry of this Consent Decree constitutes Final Judgment under Rule 54 of the Federal Rules of Civil Procedure. The City agrees to continue to implement requirements developed under and imposed by this Consent Decree following its termination.

## XXV. WAIVER OF SERVICE

121. The City hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

XXVI. PUBLIC COMMENT

122. This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments received disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate. The City consents to the entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of this Decree, unless the United States has notified the Parties in writing that it no longer supports entry of this Consent Decree.

XXVII. SIGNATORIES

123. Each undersigned representative certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

XXVIII. INTEGRATION

124. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

125. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than submissions that are subsequently submitted and Approved by EPA or Approved by EPA and MassDEP pursuant to this Consent Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 73

any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.

XXIX. APPENDICES

126. The following appendices are attached to and part of this Consent Decree:

a. Appendix 1 is EPA Region 1's draft Bacterial Source Tracking Protocol dated January 2012;

b. Appendix 2 is EPA's Guide for Evaluating Capacity, Management, Operation, and Maintenance Programs at Sanitary Sewer Collection Systems (EPA 305-B-05-002, January 2005);

c. Appendix 3 is the CMOM Program Self-Assessment Checklist, an EPA Region 1 modification of the checklist that accompanies the guidance in Appendix 2;

d. Appendix 4 is list of recipients of email notifications concerning CSO discharges;

e. Appendix 5 is the City's letter of June 17, 2013 to EPA and MassDEP;

f. Appendix 6 is EPA and MassDEP comments to Phase II LTCP Plan (MassDEP letter dated February 14, 2013 to the City);

g. Appendix 7 is MassDEP's letter of December 29, 2014 to the City; and

h. Appendix 8 is the SEP Plan.

APPROVED AND ENTERED THIS 10th DAY OF November, 2016.

[signature]
UNITED STATES DISTRICT JUDGE
District of Massachusetts

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 75

FOR PLAINTIFF, UNITED STATES OF AMERICA:

CARMEN M. ORTIZ
United States Attorney

SUSAN M. POSWISTILO (BBO #565581)
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748-3103
susan.poswistilo@usdoj.gov

8/19/2016
Date

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 76

FOR PLAINTIFF, UNITED STATES OF AMERICA, continued:

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

Brian G. Donohue
BRIAN G. DONOHUE
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
601 D. St., N.W.
Washington D.C. 20004
(202) 514-5413

8/19/2016
Date

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 77

For the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, continued:

Susan Studlien ______________________ 02/18/2016 ______
SUSAN STUDLIEN Date
Director
Office of Environmental Stewardship
United States Environmental Protection Agency, Region 1
5 Post Office Square, Suite 100
Boston, MA 02109-3912

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 77

For the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

______________________________ 7/7/16
MARK POLLINS Date
Division Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 78

For the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, continued:

Lourdes Bufill — 6/20/2016
Date

Lourdes Bufill
Attorney
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 78

For the COMMONWEALTH OF MASSACHUSETTS:

MAURA HEALEY
Attorney General

________________________________ 8/19/16
I. ANDREW GOLDBERG (BBO #560843) Date
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
617-727-2200

*U.S. and Comm. of Mass. v. City of Haverhill*
Civil Action No. ________
Page 79

For DEFENDANT CITY OF HAVERHILL, MASSACHUSETTS:

________________________ 2/4/16
JAMES J. FIORENTINI
Mayor
City of Haverhill
City Hall – Room 100
4 Summer Street
Haverhill, MA 01830

Date